Filed 11/7/23

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE BAKERSFIELD CALIFORNIAN,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>ROBERT PERNELL ROBERTS et al.,<br><br>Real Parties in Interest. | F086308<br><br>(Super. Ct. No. BF191473A)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; application for writ of mandate. Elizabet Rodriguez and Tiffany Organ-Bowles, Judges.

Davis Wright Tremaine, Thomas R. Burke and Sarah E. Burns for Petitioner.

Katie Townsend for Reporters Committee for Freedom of the Press, Californians Aware, California News Publishers Association, CalMatters, Center for Investigative Reporting doing business as Reveal, Cityside Journalism Initiative, E.W. Scripps Company, Embarcadero Media, First Amendment Coalition, Gannett Co., Inc., Hearst Corporation, KPPC/LAist, Los Angeles Times Communications LLC, The McClatchy Company, Media Guild of the West, NewsGuild-CWA Local 39213, MediaNews Group,

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion.

Inc., The Foundation for National Progress doing business as Mother Jones, Informed California Foundation doing business as Open Vallejo, Pacific Media Workers Guild, San Diego Union-Tribune LLC, Sinclair Broadcast Group, Inc., Society of Professional Journalists of Northern California, and Tribune Publishing Company as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Peter Kang, Public Defender, and Alexandria Blythe, Deputy Public Defender, for Real Party in Interest Robert Pernell Roberts.

Cynthia Zimmer, District Attorney, and John D. Allen, Deputy District Attorney, for Real Party in Interest The People.

-ooOoo-

This writ proceeding arises from a criminal prosecution. The People of the State of California (the People) and Robert Pernell Roberts (Roberts) are real parties in interest. Roberts is currently awaiting trial on charges that include murder committed under special circumstances.

The case against Roberts is based in significant part on the allegations of his codefendant, Sebastian Parra (Parra), who testified at Roberts's preliminary hearing as an uncharged prosecution witness. The People later sought and obtained a murder indictment against Parra in connection with the same underlying homicide. The cases against Parra and Roberts were then consolidated.

Following his indictment, Parra was interviewed in jail by a reporter from The Bakersfield Californian newspaper (the Newspaper), i.e., petitioner herein. The Newspaper published an article based on Parra's interview statements. Soon thereafter, Roberts served the Newspaper with a subpoena demanding all unpublished material relating to the interview. The Newspaper unsuccessfully moved to quash the subpoena and was later adjudged in contempt for disobeying an order to produce the subject material.

2.

The Newspaper's motion to quash relied on the newspersons' shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070) (the shield law), which protects a newsperson from being adjudged in contempt "for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070, subd. (a).) However, as held in *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 793 (*Delaney*), shield law immunity "must yield to a criminal defendant's constitutional right to a fair trial." The *Delaney* court articulated a two-part test for determining whether a criminal defendant's rights and discovery needs outweigh the protections of the shield law in a given case.

The Newspaper contends respondent, the Kern Superior Court (superior court), erroneously denied its motion to quash and consequently based the contempt judgment on an invalid order. We agree the adjudication of contempt was invalid, but for reasons unrelated to the merits of the motion ruling. The published part of the opinion explains why the motion to quash was appropriately denied.

FACTUAL AND PROCEDURAL BACKGROUND

*Death of Benny Alcala, Jr.*

On August 24, 2022, at approximately 8:26 p.m., Bakersfield police began receiving reports of a shooting near a shopping center on Stockdale Highway. Investigating officers located the body of decedent Benny Alcala, Jr. (the victim). He was found lying face up on a sidewalk just beyond the front parking area of a Target store. According to police testimony, the parking lot is shared by multiple businesses including Target and a McDonald's restaurant. "Next to the McDonald's in that shared parking lot there is a charging station for electric vehicles," which has six charging stalls. "Between [stall] number two and [stall] number three there is a cement walkway that leads up to the sidewalk" where the victim's body was discovered.

3.

Six expended nine-millimeter bullet casings were found near the victim's body, as was a Target shopping bag containing merchandise. A receipt showed the items were purchased at 8:19 p.m. Inside the victim's pants pockets were his wallet, an iPhone, and the keys to an electric car registered in his name. The vehicle was plugged into the charging station (in stall "number three"), and the Target bag was found "at the beginning of that walkway that led up to the sidewalk."

An autopsy confirmed the victim died from a bullet wound. He had been shot once in the back and once in the arm. According to media reports, the victim was 43 years old.

### Homicide Investigation

The victim's family told police he had gone out that night to charge his car. There was no evidence of theft or vehicle burglary. However, an eyewitness reported seeing three men interacting near the charging station in a way that "seemed kind of peculiar." Two of them "were in close proximity to each other" "in the little walk path between the parking lot and the sidewalk." The third man had been standing "about 10 to 15 yards away from the other two."

A second witness reported hearing gunshots and turning to see two people on the sidewalk. One of them, described as a Hispanic male wearing a white shirt, had "his hand raised up as if holding a gun" or pointing something. The witness did not actually see a gun.

Surveillance video obtained from a bank across the street reportedly showed "somewhat grainy" footage of a man with a shopping bag walking toward the charging station at 8:22 p.m. A person in a white shirt followed behind him, coming into view at approximately 8:24 p.m. According to police testimony, there was "motion between two subjects walking in between where the walkway leads to Stockdale [Highway]." The person in the white shirt "disappear[ed] momentarily and re-appear[ed] at [8:26 p.m.], walking towards McDonald's."

4.

In viewing footage from Target's security cameras, police were able to confirm the victim had walked out of the store at approximately 8:20 p.m. At or about 8:21 p.m., two people entered the store and apparently caught the attention of the security staff. An employee "zoomed the camera in" on them, obtaining close-up views of a Black male in a white shirt and a lighter-complected, possibly Hispanic male wearing a maroon shirt. At approximately 8:22 p.m., those men exited Target and walked across the parking lot toward the electric vehicle charging station.

After contacting other nearby businesses and obtaining more videos, police constructed a timeline of the suspects' movements. The Black male had entered a BevMo! store sometime between 5:00 p.m. and 6:00 p.m. and spent $21.21 on alcoholic beverages. (Conflicting information in the record puts the time of purchase at either 5:15 p.m. or 5:55 p.m.) He returned to the store at approximately 7:40 p.m., this time accompanied by the lighter-skinned man in the maroon shirt, and he spent $11.90 on a bottle of vodka. The pair left BevMo! at approximately 7:47 p.m. and went to McDonald's. At approximately 8:02 p.m., they appeared on a Target security camera walking past the building and into an adjacent park. They exited the park at 8:18 p.m. and proceeded into Target. After leaving Target at 8:22 p.m. and heading toward the charging station, they next appeared on camera at 8:28 p.m. walking back toward the park.

The Black male wore a white shirt throughout the videos. The other suspect wore a maroon shirt most of the time, but he was occasionally seen in a white tank top and carrying a backpack. However, the Target videos from 8:22 p.m. and 8:28 p.m. showed him in the maroon shirt.

On or about August 26, 2022, a tipster contacted the Bakersfield police department regarding some odd text messages the tipster had received on the night of the shooting. Detectives investigated and verified the information. The tipster had received both a phone call and a text message at 10:54 p.m. A second text message followed one minute

later. Because the tipster did not recognize the phone number, the tipster did not answer the call or respond to the messages. The first message said, "I just killed somebody." The second said, "Watch the news."

The tipster's information led police to one of the real parties in interest: Roberts. Released from prison in December 2021, Roberts was on postrelease community supervision (PRCS) at the time of the shooting. He had recently updated his contact information with his PRCS supervisor, and the phone number he provided matched the one from which the text messages originated. The tipster, however, denied knowing Roberts.

Upon further investigation, it was determined that the Black male in the surveillance videos was Roberts. The record does not explain how, but the other suspect was identified as Sebastian Parra.

***Parra's First Police Interview***

On August 29, 2022, Parra was taken into custody and questioned about the shooting.

**Part 1**

Parra explained that despite being employed, he was homeless and essentially resided in a park near where the shooting had occurred. At first he claimed to have merely "heard that there was a shooting," but then added, "I mean, possibly I could tell you who did it." He then referred to someone who "was saying he needed a ride home." A detective asked, "[H]ow did that turn into a shooting?" Parra replied, "I don't know."

As the interview progressed, Parra described meeting a man on the night of the incident who matched Roberts's description. This person, who had called himself "AWOL," initiated contact with Parra near an amphitheater in the park. AWOL was a stranger to him, but Parra accepted his invitation to sit down and consume some alcoholic beverages. When detectives showed Parra video surveillance images of Roberts, he confirmed that Roberts and AWOL were the same person.

After finishing the drinks, Roberts had wanted to buy more alcohol. When Parra told him he was "broke," Roberts offered to pay. In Parra's initial telling of the events, they purchased a bottle of liquor from BevMo!, bought sodas at McDonald's, and then returned to the park. After "chilling for a bit," Roberts "ended up leaving the park again, … [saying] he had to get back to the East Side or something like that[,] or to the [h]ood."

Parra revised his story after detectives told him, "[W]e got you at Target." However, he recounted only partial details of the incident. After being urged to "tell the truth" and "[not] go down for this," Parra finally alleged that Roberts had said "he wanted to rob the guy." Parra later added that Roberts had commented about the victim presumably having money since he drove an electric car.

Parra's account of the shooting was vague. He claimed to have been standing about 12 feet away when Roberts first interacted with the victim. The sound of a gunshot followed, but Parra allegedly saw nothing due to the darkness outside and shrubbery blocking his view. Roberts soon reappeared and was mumbling to himself about the victim "walking away." Parra told detectives he got "spooked" by the gunfire and immediately departed from the scene. Roberts followed him. Parra went on to say, "So, at that point, I'm pretty sure I go into the park and try to lose him." A detective sought clarification: "So, you just went back into the park, and you saw him trailing you, and you lost him?" Parra replied, "Yeah."

**Part 2**

Following a break, the detectives asked Parra to retell his story from the beginning. Parra described meeting Roberts outside of a restroom next to an amphitheater in the park. After accepting his offer to share a "12 pack," Parra listened as Roberts described "his situation" and made statements about "how he had to get back to … the hood." Roberts allegedly revealed that he had previously been convicted of robbery and "GTA" (presumably meaning grand theft auto), and spoke of plans to "turn

7.

himself in." At some point Roberts received a phone call, supposedly from a girlfriend, and he again made comments about "turning [himself] in." When Roberts offered to pay for the bottle of liquor, he allegedly said, "I have to spend this little money that I have left."

After going to BevMo! and McDonald's, the men returned to the amphitheater and drank there until Roberts wanted to "refill … his cup." Parra's language was imprecise, but it seemed to indicate they intended to return to McDonald's. On the way there, Roberts had wanted to stop at Target to use the restroom (a detail consistent with the surveillance video). During the same general timeframe, Roberts seemed drunk and was mumbling "about how he had to get back to the East Side, or to the hood, and then that he would like basically do whatever [it took to get there]." When detectives asked if he was quoting Roberts, Parra said, "I mean, not necessarily like said would do whatever it took, but … he was just saying, 'If I have to take somebody's car,' [and was] listing his GTA and like his robbery and like all that stuff." Parra further alleged that Roberts had "tried to get an Uber" but "didn't have enough on his Uber" for a ride.

While discussing what happened between their departure from Target and the encounter with the victim, Parra alleged, "[J]ust out of nowhere he pointed out like the car, and he was like, 'That car. … I'ma take it.'" Parra also repeated the allegation that Roberts had said, "'[H]e's got to have money.'" When Roberts contacted the victim, Parra "kept a distance" because he "didn't really want any part in that." Parra continued to deny witnessing the shooting or ever seeing Roberts in possession of a gun.

When requestioning Parra about what happened after the shooting, detectives reminded him that "there's cameras all over the place." In response, Parra told a story about walking to a Walmart on Rosedale Highway. Roberts had allegedly followed him, stopping a few times along the way to try to arrange for an Uber ride. When Parra reached Walmart, he sat down and "ended up dozing off" for about 20 to 30 minutes before "walking back."

8.

Parra's statements about separating from Roberts were as follows: "The last time I saw him was once I already left [Walmart], like, because like I said, I had dozed off, and then I woke up, and I'm pretty sure he was asleep too. [¶] … [¶] So then, I ended up walking away. Like, I didn't wake him up, I didn't tell him anything. I just ended up walking away. [A]nd then after that I … never saw him again."

The interview concluded with Parra formally identifying Roberts from a photographic lineup. He was subsequently released from custody.

*Prosecution of Roberts*

On September 1, 2022, the Kern County District Attorney filed a criminal complaint charging Roberts with first degree murder (Pen. Code, §§ 187, subd. (a), 189; count 1), attempted second degree robbery (*id.*, §§ 211, 212.5, subd. (c), 664; count 2), and unlawful firearm possession (*id.*, § 29800, subd. (a)(1); count 3). Count 1 included a special circumstance allegation of murder committed during an attempted robbery. (*Id.*, § 190.2, subd. (a)(17)(A).) A firearm enhancement was alleged pursuant to Penal Code section 12022.53, subdivision (d).

A preliminary hearing on the charges began on October 5, 2022, and concluded the next day. Parra was subpoenaed as a prosecution witness. Facing no charges at the time, he appeared without counsel and testified about the night of the shooting.

*Parra's Testimony*

Parra identified himself and Roberts as the men in the Target videos. Parra also confirmed he is Hispanic. He was 21 years old at the time of the shooting.

**Direct Examination**

Parra testified to the same basic story he had told to the detectives, but there were many inconsistencies. For example, he denied Roberts had made any direct statements about wanting to rob the victim or steal his car. He also struggled to recall anything Roberts may have said after exiting Target and prior to the shooting. After much effort to refresh his recollection with the police interview, Parra testified that Roberts said the

9.

victim "might have had money because he was there charging his vehicle." Parra also testified to Roberts's alleged remark about needing to get "'back to the hood,'" claiming the statement was made "sometime throughout the night."

Regarding their post-shooting activities, Parra testified that he and Roberts "walked through the park" and then "headed towards Walmart [on] Rosedale." Parra estimated it took them 30 to 45 minutes to get there, and he claimed to have fallen asleep after they arrived. Parra further testified, "Once I woke up, I didn't see [Roberts] anymore." The prosecutor asked, "After going to sleep, did you ever see him again that evening?" Parra answered, "No."

**Cross-examination**

The questioning by Roberts's attorney reflected a theory of Parra being the actual killer. This was most apparent in questions concerning the unrecovered gun used in the shooting. Counsel first elicited Parra's admission to being the registered owner of a nine-millimeter firearm. That led to questions such as, "And you told [Roberts] that you had a firearm, didn't you?" "Didn't you have a firearm with you on that date?" and "Didn't you load a firearm in front of [Roberts] on that date?" Although Parra denied the accusations, counsel's intended message was conveyed.

When pressed on the issue, Parra testified to having given his firearm to a friend for "safekeeping" in approximately May or June of that year. In other words, three to four months prior to the shooting. Parra identified the friend by name and said the person lived in another part of the state. Defense counsel asked, "Does he still have [the gun] to this date, as far as you know?" Parra replied, "As far as I know, yeah."

Parra was also questioned about a defense exhibit reportedly showing Roberts incurred charges for using a Lyft ridesharing application on his phone after the shooting. This line of questioning served a dual strategy. First, defense counsel wanted to show Roberts had the ability and financial means to obtain a ride that night. Second, and more

subtly, it helped establish a timeline to support a theory that it was Parra who sent the incriminating text messages from Roberts's phone. (See further discussion, *post*).

Parra admitted that after the shooting, Roberts had tried to obtain a Lyft ride while they were near a Yard House restaurant "on the opposite side of the shopping center compared to the McDonald's." Parra estimated this was around 9:00 p.m. and possibly as late as 9:30 p.m., which would mean he and Roberts remained in the area for 30 minutes to an hour before heading to Walmart. When confronted about his inconsistent stories regarding Roberts's whereabouts at the end of the night, Parra disclaimed the version he had told to police. Similar to his testimony on direct examination, Parra stated that Roberts was with him when he fell asleep but gone when he woke up.

**Impeachment of Gun Testimony**

On the second day of the hearing, Roberts's attorney produced the "friend" to whom Parra had allegedly given his firearm for safekeeping. A defense investigator managed to locate the witness the previous evening, and the witness had agreed to drive a considerable distance to testify. The witness unequivocally denied Parra's story. He testified that he knew Parra but had "cut all ties with him almost a year ago" and had no knowledge of Parra owning or possessing a firearm.

*Further Proceedings*

The preliminary hearing concluded with Roberts being held to answer all charges in the complaint. A conforming information was filed on October 13, 2022. On December 19, 2022, the People waived pursuit of the death penalty.

*Prosecution of Parra*

Subsequent to Roberts's preliminary hearing (the record does not say when), the Kern County District Attorney initiated grand jury proceedings regarding Parra's involvement in the shooting. On December 22, 2022, the grand jury returned a true bill on two counts alleged in a second amended indictment: first degree murder and attempted robbery.

11.

*Relevant Media Coverage*

On December 29, 2022, the Newspaper published an article under the headline, "Prosecution's key witness indicted, arrested in death of [the victim]." Although Parra's indictment was discussed in the opening paragraphs, the article focused on Roberts's preliminary hearing. There were quotes from witness testimony and a sentence that read, "Parra owns a 9mm gun but left it at a friend's house outside Bakersfield for 'safe keeping' and believes it's still there, he testified." The article also reported on the holding order issued at the end of the preliminary hearing. However, there was no mention of how Parra's testimony about the nine-millimeter gun was impeached by the very person he had identified as an exculpatory witness.

On February 23, 2023, Parra was interviewed in jail by the reporter who had written about his indictment. On February 27, 2023, the Newspaper published another article ("the article") by the same reporter. The headline read, "'I didn't commit the crime' [¶] Man indicted in shooting death … denies he had any part in killing."

The opening paragraph of the article said, "Parra doesn't have a clue why he's been indicted in the shooting death of [the victim]." Subsequent paragraphs stated, in pertinent part, "He told The Californian he 'didn't do anything' to kill [the victim]…. [¶] … [¶] And, Parra said, it was unfathomable for him that he would be arrested on suspicion of gunning down [the victim]."

The article continued: "The Californian has learned conflicting testimony from Parra may explain why prosecutors sought an indictment." This statement foreshadowed a discussion, several paragraphs later, about the defense witness who testified Parra's story regarding the location of his firearm was a lie. Although other parts of the article quoted from the preliminary hearing, the information concerning the impeachment of Parra's testimony was attributed to "a motion by [defense counsel] filed in Roberts' case."

For our purposes, the most important statements in the article were as follows:

12.

- "[Parra] lived at The Park at River Walk and was on his way to the restroom when he was stopped by Roberts, Parra told The Californian. They struck up a conversation about their life circumstances and then started drinking alcohol together in the park, he testified."

- "In court, Parra said he heard a gunshot but saw no muzzle flash. [¶] Frightened, Parra began to walk away and Roberts caught up to him, he said in court. Parra also said to a reporter he didn't want to question or anger Roberts after hearing the gunshots, so he hung around with him that night. [¶] Parra said during the jailhouse interview he walked away from Roberts later that night, after Roberts had fallen asleep."

- "After the preliminary hearing, Parra told a reporter he was interviewed again by police. That's when officers asked him about the gun, and Parra said he admitted to police he carried a gun with him and it wasn't at his friend's house. He added police never asked him about the gun when he was first interviewed about the incident."

- "Parra recalled to The Californian leaving his backpack behind when walking to the restroom and first running into Roberts. The backpack is where the gun was stored, Parra said, theorizing that's how Roberts could have gotten a gun. [¶] But Parra said he didn't know it was missing until the next day when he opened the backpack to pull out a change of clothes—he said he never opened the bag to see if the firearm was still inside the day [the victim] died. He also said he didn't kill [the victim] and carried a gun because he was living on the streets."

- "'I didn't commit the crime and didn't know the weapon was gone until the next day,' Parra said."

- "Police also said a phone number associated with Roberts sent a text message saying 'I just killed someone' and to turn on the news. Parra denied to a reporter ever physically touching Roberts' phone, and only looked at it for 30 seconds while trying to get on a Wi-Fi hot spot."

*Further Procedural Background*

On February 1, 2023, a prosecution motion to consolidate the cases against Roberts and Parra was granted. A new charging document, entitled "Consolidated

13.

Indictment/Information," was filed the same day. The substantive charges were unchanged.

In March 2023, Roberts's counsel served a subpoena duces tecum upon the Newspaper for the following items: "The complete recording, both audio and video, of the interview with Sebastian Parra at the Kern County Jail in February 2023. If no recording exists, a copy of the complete notes from the interview as well as a list of all questions asked to Sebastian Parra."

The Newspaper moved to quash the subpoena based on the newspersons' shield law. In a supporting declaration, the reporter who wrote the article attested she "did not create an audio or video recording of the interview." She further declared any responsive documents "would have been obtained or created in the course of reporting the [a]rticle" and thus constituted "unpublished, confidential journalistic work product."

Roberts later filed a "Motion for Release of Records," which effectively served as an opposition to the motion to quash. The briefing alleged the subpoenaed records were "necessary and material" to Roberts's defense, but no further explanation was provided. Citing a fear of "'revealing possible defense strategies and work product to the prosecution,'" Roberts's counsel requested an in camera hearing "to present [the defense's] theories regarding the relevancy and entitlement to the subpoenaed records."

The competing motions were heard on April 4, 2023. The hearing focused on Roberts's burden to "make a threshold showing that there is a reasonable possibility the information sought will materially assist with the defense." (*People v. Parker* (2022) 13 Cal.5th 1, 33, citing *Delaney*, *supra*, 50 Cal.3d at p. 808.) The conclusory assertions in Roberts's briefing were ruled insufficient to meet the standard. The superior court declined to conduct in camera proceedings, and it denied Roberts's motion without prejudice. The Newspaper's motion to quash was granted. However, in anticipation of further discovery efforts by Roberts, the court ordered the Newspaper to preserve all material requested in the subpoena.

14.

On or about April 10, 2023, defense counsel served another subpoena duces tecum upon the Newspaper for the previously requested items. The Newspaper filed another motion to quash, which was supported by an almost identically worded declaration from the reporter who wrote the article. The defense again responded with its own "Motion for Release of Records" in lieu of opposition papers.

Roberts attempted to meet his threshold burden by alleging (1) he "has been falsely accused by [Parra] of committing this crime," and (2) Parra "is the person who shot [the victim]." Roberts further accused Parra of perjuring himself at the preliminary hearing and continually "trying to cover up his own involvement and lying to try to escape culpability."

Focusing on Parra's various statements about the nine-millimeter firearm and allegations of a robbery motive, Roberts argued "the number of times [Parra] has changed his story is highly relevant and material to … Roberts' defense." In other words, since the People's ability to prove the charges and allegations against Roberts "will revolve around [Parra's] credibility," it is reasonably possible that Parra's unpublished statements to the reporter will materially assist the defense in impeaching his credibility.

Roberts again claimed there were "additional theories of relevancy" that could not be disclosed without revealing "defense strategies and work product to the prosecution." An in camera hearing was requested to allow his attorney to "thoroughly explain" why the subpoenaed material was/is important to his defense. The Newspaper, however, was adamantly opposed to any in camera proceedings. Although Roberts had not suggested it, the Newspaper's briefing argued the superior court "also should not review the subpoenaed information *in camera*."

The motions were heard on May 10, 2023. The superior court did not conduct in camera proceedings, but it did take judicial notice of the preliminary hearing transcript. Following arguments by the parties, Roberts was found to have satisfied his threshold burden. The court then heard argument on the remaining issues, i.e., "(1) whether the

15.

unpublished information is confidential or sensitive; (2) whether the interests sought to be protected by the shield law will be thwarted by disclosure; (3) the importance of the information to the defendant; and (4) whether there is an alternative source for the information." (*People v. Parker*, *supra*, 13 Cal.5th at pp. 33–34, citing *Delaney*, *supra*, 50 Cal.3d at pp. 810–811.)

Regarding the threshold burden, the superior court said, "Clearly [defense counsel] does not know what's in the reporter's notes since they have not been disclosed. So there's no way for [counsel] to actually tell the Court [']I know that those answers that he gave will in fact assist.['] [But] there is no requirement that [counsel] in fact prove that the notes will be helpful." Further remarks by the court suggested the finding of a reasonable possibility that the material sought will support the defense theory of Parra being the true killer and/or provide additional impeachment evidence. As for the factor test, the court found (1) the information sought is neither confidential nor sensitive; (2) disclosure "[will] not hinder the news gathering ability of the reporter"; (3) the information sought is "highly important to the defense" and "could potentially exonerate" Roberts; and (4) the defense has "no other alternative means" by which to obtain the information.

On May 11, 2023, the superior court ordered the Newspaper to comply with Roberts's subpoena within six days. On May 15, 2023, the Newspaper petitioned this court for writ relief in relation to that order. On May 16, 2023, the petition was denied as premature because there was no adjudication of contempt. (See *New York Times Co. v. Superior Court* (1990) 51 Cal.3d 453, 459–460.) The order denying the petition noted that "'[t]o avoid confinement under a judgment of contempt that may subsequently be set aside, a trial court should stay its judgment of contempt to allow the contemner newsperson sufficient time in which to seek writ relief if the trial court believes there is any colorable argument the newsperson can make against the contempt adjudication.'" (Quoting *id*. at p. 460.)

16.

On May 19, 2023, the superior court issued an order shortening time with regard to a motion filed that day by Roberts entitled, "Motion to Address the Fact That [the Newspaper] Has Refused to Comply With the Court's Previous Order." (Some capitalization omitted.) The moving papers gave notice of a hearing set for May 24, 2023, and of Roberts's intention to "ask the [superior court] to find [the Newspaper] in contempt of court." A supporting declaration by Roberts's attorney alleged the Newspaper had failed to comply with the order issued on May 11, 2023. According to an attached proof of service, the notice of motion and supporting documents were served upon the Newspaper's legal counsel via e-mail.

On the same day the motion was filed, the Newspaper filed a response. It stated, in pertinent part: "[I]n light of its desire to have appellate review of this Court's May 11, 2023 Order, [the Newspaper] respectfully requests that, at the May 24 hearing, this Court hold [the Newspaper] in contempt of its May 11 order to produce its unpublished newsgathering materials so that the Court of Appeal may review this order. Consistent with the Court of Appeal's May 16 order, [the Newspaper] also respectfully requests that this Court stay its judgment of contempt by 10 days to allow the Court of Appeal to decide whether to issue an extraordinary writ."

On May 24, 2023, the superior court signed and filed a written order prepared by Roberts's attorney. The portion drafted by counsel read: "IT IS HEREBY ORDERED that [the Newspaper] be held in contempt of court for failing to comply with the May 11, 2023, court order to comply with defense counsel's subpoena in the above-entitled case." (Boldface omitted.) The signed order also contained a handwritten sentence: "Imposition of judgment stayed 10 days until 6/5/23[.]"

On or about the day the contempt order was issued, Roberts's counsel served a trial subpoena upon the reporter who wrote the article. Although the trial subpoena is relevant to the present dispute, its enforceability is not at issue here.

17.

On May 25, 2023, the Newspaper petitioned this court for "a writ of mandate, prohibition, and/or review, or other appropriate relief, directed to [the superior court], requiring [the superior court] to immediately vacate [the orders issued on May 11, 2023, and May 24, 2023,] and to issue an order quashing the subpoena."

On May 30, 2023, this court issued an order to show cause why the Newspaper's petition should not be granted. The order directed Roberts and the People to file written returns. In addition, all trial court proceedings were ordered stayed pending the resolution of this matter.

Roberts argues that the petition should be denied. The People, as stated in their return, take "no position on the substantive issue[s] … and only assert their right to have the matter addressed expeditiously to effectuate the People's right to a speedy trial." According to the People's return, the murder trial was scheduled to begin on June 28, 2023. The People's return also states that Parra has never "joined or otherwise taken action in support or opposition to [Roberts's] motions/subpoenas to obtain the unpublished notes from the [Newspaper]."

In July 2023, this court granted a joint request by The Reporters Committee for Freedom of the Press and 22 additional media organizations to file an amici curiae brief in support of the petition.

## DISCUSSION

## I.    The Contempt Judgment Is Procedurally Defective[*]

"When the court orders counsel or a party to do something that counsel or the party does not wish to do, there are two choices:  (1) Attack the order immediately by a petition for writ of prohibition or mandate, or (2) violate the order and mount a collateral attack on it by seeking review of the resulting contempt judgment or order, usually by a petition for a writ of review … or habeas corpus."  (1 Cal. Civil Writ Practice

---

[*]See footnote, *ante*, page 1.

(Cont.Ed.Bar 4th ed. 2022) § 16.130, p. 16-91; see *In re Misener* (1985) 38 Cal.3d 543, 558 ["An order of contempt cannot stand if the underlying order is invalid"]; *In re M.R.* (2013) 220 Cal.App.4th 49, 65 ["The proper method to challenge a contempt order is to seek extraordinary writ relief"].)  However, "[b]ecause the shield law provides only an immunity *from contempt*, there is nothing from which to seek [writ] relief until a newsperson has been adjudged in contempt." (*New York Times Co. v. Superior Court*, *supra*, 51 Cal.3d at p. 459.)  Therefore, "a newsperson's petition for extraordinary relief is premature until a judgment of contempt has been entered." (*Id*. at p. 460.)  This is why the Newspaper's first attempt to obtain writ relief in connection with the denial of its motion to quash was rejected.

The Newspaper's desire for immediate review of the motion to quash ruling explains why it responded to Roberts's compliance motion by affirmatively requesting to be held in contempt.  But in the parties' haste to initiate this writ proceeding, several mistakes were made.  The parties fail to address the problems in their briefing, but we cannot ignore those issues.  "In reviewing a civil contempt order, the appellate court does not presume the order to be correct.  Rather, because of the summary nature of civil contempt, all presumptions are drawn *against* the validity of the contempt order." (*In re D.W*. (2004) 123 Cal.App.4th 491, 501, italics added; accord, *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1256.)

Disobedience of a subpoena or any lawful court order is punishable as civil contempt (Code Civ. Proc., § 1209, subd. (a)(5), (10)) or, if initiated by a public prosecutor, as criminal contempt (see *In re McKinney* (1968) 70 Cal.2d 8, 14 ["a 'violation of section 166 of the Penal Code is a misdemeanor and as such it is to be prosecuted in the same manner as other misdemeanors'"]).  The contempt proceedings in this case were civil in nature.  "A civil contempt may be punished by a fine or imprisonment or both (Code Civ. Proc., § 1218) or, under appropriate circumstances, performance may be compelled by indefinite imprisonment (Code Civ. Proc., § 1219)."

19.

(*City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 339.) Although civil contempt is "quasi-criminal" in nature, the applicable law is Code of Civil Procedure sections 1209 through 1222. (*People v. Gonzalez* (1996) 12 Cal.4th 804, 816; *Kim v. R Consulting & Sales*, *Inc*. (2021) 67 Cal.App.5th 263, 274.)

An act of civil contempt is either direct or indirect (also known as constructive). (*In re McKinney*, *supra*, 70 Cal.2d at p. 10, fn. 2.) "'Direct contempt is that committed in the immediate view and presence of the court or of the judge at chambers; all other contempts are indirect ….'" (*Fine v. Superior Court* (2002) 97 Cal.App.4th 651, 665.) A direct contempt may be punished summarily and requires only a written order "reciting the facts as occurring in such immediate view and presence, adjudging that the person proceeded against is thereby guilty of a contempt, and that he or she be punished as therein prescribed." (Code Civ. Proc., § 1211, subd. (a).) The record before us contains no evidence of a direct contempt. We note that different judges signed the order directing the Newspaper to comply with Roberts's subpoena and the order finding it in contempt for failure to do so. (See *Hanson v. Superior Court* (2001) 91 Cal.App.4th 75, 82 [direct contempt must be adjudicated by the judge who witnessed the contemptuous conduct].)

"Violating a court order is a '"common example"' of indirect contempt." (*Moore v. Superior Court* (2020) 57 Cal.App.5th 441, 456.) The essential elements consist of a valid court order, the contemner's knowledge of the order, the contemner's ability to comply with the order, and the contemner's willful disobedience. (*Ibid*.; *Board of Supervisors v. Superior Court* (1995) 33 Cal.App.4th 1724, 1736.) Adjudication of an indirect contempt requires "a sequential series of steps: (1) an affidavit is presented to the court of the facts constituting the contempt; (2) a warrant of attachment or order to show cause is issued; (3) service of the warrant or order; (4) if there is a warrant (not applicable here), arrest and bail may occur; (5) a hearing, at which the judge investigates the charge and hears any answer, including witnesses; and (6) findings and punishment." (*Moore*, *supra*, at p. 454; accord, *Arthur v. Superior Court* (1965) 62 Cal.2d 404, 407–408 [noting

20.

this "more elaborate procedure" requires an affidavit, an order to show cause, and a hearing].)

An affidavit or declaration and *personal service* of the order to show cause upon the alleged contemner are jurisdictional prerequisites. (*Cedars-Sinai Imaging Medical Group v. Superior Court* (2000) 83 Cal.App.4th 1281, 1286-1288 (*Cedars-Sinai*); see Code Civ. Proc., §§ 1016 [the ordinary rules of service "do not apply to the service of a summons or other process, or of any paper to bring a party into contempt"], 1211, subd. (a), 1212.) Roberts presented a declaration but evidently did not seek or obtain an order to show cause. As in *Cedars-Sinai*, where contempt orders were vacated due to jurisdictional defects, Roberts attempted to initiate the contempt proceedings by filing a noticed motion. (*Cedars-Sinai*, at p. 1284.)

We are unaware of any authority for obtaining an indirect contempt judgment without the issuance of a warrant of attachment or an order to show cause. (See Code Civ. Proc., § 1212; *Arthur v. Superior Court*, *supra*, 62 Cal.2d at p. 408 [stating that in cases of indirect contempt, "an order to show cause must be issued"].) The order to show cause is what "commences a 'separate action' on the contempt charges." (*In re M.R.*, *supra*, 220 Cal.App.4th at p. 58, quoting *People v. Gonzalez*, *supra*, 12 Cal.4th at p. 816.) Furthermore, the declaration/affidavit was served upon the Newspaper's attorney via e-mail, and it is unclear whether inadequate service was, or even could be, waived by the Newspaper's subsequent participation through counsel. (See *Koehler v. Superior Court* (2010) 181 Cal.App.4th 1153, 1169 ["[A] contempt citation must be served personally. Service of an order to show cause to bring a party into contempt is insufficient if made by mail on the party's attorney of record"]; *Cedars-Sinai*, *supra*, 83 Cal.App.4th at pp. 1287–1288.)

Apart from the issues discussed above, the contempt order is defective in its failure to specify the punishment to be imposed. (Code Civ. Proc., § 1211, subd. (a); see *In re Ringgold* (2006) 142 Cal.App.4th 1001, 1011 ["A valid written contempt order

21.

consists of three elements … [including] a statement of the punishment"].)  In addition, a valid judgment of indirect contempt must address the contemner's ability to comply with the subject order and the contemner's willful disobedience.  (*Koehler v. Superior Court*, *supra*, 181 Cal.App.4th at p. 1169.)  While this may seem like a technicality, the party subject to the subpoena and compliance order was not the reporter whose personal notes were sought; it was the Newspaper.  Although the existence of the notes was certainly implied at various times, the Newspaper's ability to produce them was never actually alleged or adjudicated in the contempt proceedings.

Moreover, the order ambiguously states, "Imposition of judgment stayed 10 days …."  This could be read to indicate a deferral of the entry of judgment rather than a stay of the unspecified punishment, which would require us to again deny the Newspaper's petition as premature.  (*New York Times Co. v. Superior Court*, *supra*, 51 Cal.3d at p. 460.)  We will construe the order as a judgment, but also conclude it is procedurally invalid.

As noted in other decisions, the standard of review "places the burden on the [superior] court to 'dot all the "i's" and cross all the "t's."'"  (*In re D.W.*, *supra*, 123 Cal.App.4th at p. 501; see *Cedars-Sinai*, *supra*, 83 Cal.App.4th at p. 1287.)  "Because civil contempt is generally the last arrow in the judicial quiver, it is not a routine and familiar exercise for most courts.  On the rare occasion when a court is called upon to invoke its contempt authority, the court is well advised to stop and refresh its recollection as to the intricacies of the requirements placed on the judge.  Otherwise, the order may not fare well under the appellate microscope."  (*In re D.W.*, at p. 501, fn. omitted.)

The question remains whether we should address the ruling on the Newspaper's motion to quash.  Unlike in *New York Times Co.*, doing so would not deprive the superior court "of the opportunity to decide in the first instance whether the shield law applies to the facts of [this] case."  (*New York Times Co. v. Superior Court*, *supra*, 51 Cal.3d at p. 459.)  Nor would it "allow [the Newspaper] to avoid the responsibility of choosing

22.

between disclosing information or being held in contempt." (*Id*. at p. 460.) The Newspaper has already made its choice by failing to comply with Roberts's subpoena and affirmatively requesting to be held in contempt.

The parties rightfully view the controversy as ripe for adjudication and are eager for a decision on the merits. Also, in addition to the current dispute between Roberts and the Newspaper, the same issues are expected to arise when Roberts's counsel attempts at trial to examine the reporter who wrote the article. (The Newspaper's motion to quash included a request for "an order preventing Roberts from issuing a trial subpoena to [the reporter who wrote the article].") We will therefore consider, and ultimately deny, the request in the petition to compel the superior court to vacate the order denying the motion to quash. (Cf. *New York Times Co. v. Superior Court*, *supra*, 51 Cal.3d at p. 461 ["Under these circumstances, no purpose would be served by remanding the case to the trial court merely for the purpose of entering a contempt judgment"].)

## II.    The Motion to Quash Was Properly Denied

### A.    Legal Overview

California's shield law traces back to 1935, when the Legislature enacted statutory protections to ensure "that newspaper employees could not be adjudged in contempt for refusal to disclose their sources to courts or legislative or administrative bodies." (*Delaney*, *supra*, 50 Cal.3d at p. 795, paraphrasing Code Civ. Proc., former § 1881, subd. 6.) "When the laws of evidence were codified in 1965, the newspersons' shield law became Evidence Code section 1070." (*Rosato v. Superior Court* (1975) 51 Cal.App.3d 190, 217.) The statute underwent subsequent revisions, "most notably in 1974, when the Legislature added a protection for the refusal to disclose unpublished information." (*In re Willon* (1996) 47 Cal.App.4th 1080, 1090.)

"The most significant development in the evolution of California's shield law took place in 1980, when the voters passed Proposition 5, thereby incorporating the shield law

into the state Constitution." (*In re Willon*, *supra*, 47 Cal.App.4th at p. 1090.) Today, the California Constitution provides that newspersons, including publishers, editors, and reporters, "shall not be adjudged in contempt … for refusing to disclose the source of any information procured" for publication in a newspaper "or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." (Cal. Const., art. I, § 2, subd. (b).) These protections also remain codified in Evidence Code section 1070.

"The shield law is both expansive and narrow.… [¶] … Most significantly, it only provides an immunity against contempt, rather than a more expansive privilege against testifying, as exists in other states." (*Rancho Publications v. Superior Court* (1999) 68 Cal.App.4th 1538, 1543; accord, *Delaney*, *supra*, 50 Cal.3d at p. 797, fn. 6 ["the shield law provides only an immunity from contempt, not a privilege"].) "The shield law is, by its own terms, *absolute* rather than qualified in immunizing a newsperson from contempt for [not] revealing unpublished information obtained in the newsgathering process." (*Miller v. Superior Court* (1999) 21 Cal.4th 883, 890.) "Nonetheless, … the protection of the shield law must give way to a conflicting federal constitutional right of a criminal defendant," e.g., the right to a fair trial. (*Id*. at p. 891; accord, *People v. Frederickson* (2020) 8 Cal.5th 963, 1015.)

A party seeking to invoke the shield law has the initial burden to demonstrate its applicability. (*Delaney*, *supra*, 50 Cal.3d at p. 806, fn. 20.) This includes establishing that the information sought was obtained during the newsgathering process and remains unpublished. (*Id*. at p. 805, fn. 17; see *Rancho Publications v. Superior Court*, *supra*, 68 Cal.App.4th at p. 1544.) However, "the shield law's protection is not contingent on a showing that a newsperson's unpublished information was obtained in confidence." (*New York Times Co. v. Superior Court*, *supra*, 51 Cal.3d at p. 456.) The term "unpublished information" is broadly defined as information "not disseminated to the public by the person from whom disclosure is sought, … [including but] not limited to,

all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated." (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070, subd. (c).)

Once the entitlement to immunity is shown, "[t]he burden then shifts to the criminal defendant seeking discovery to make the showing required to overcome the shield law." (*Delaney*, *supra*, 50 Cal.3d at p. 806, fn. 20.) At the threshold, the defendant "must show a *reasonable possibility* the information will materially assist his defense." (*Id*. at p. 808.) "[T]he defendant's showing need not be detailed or specific, but it must rest on more than mere speculation." (*Id*. at p. 809.)

The concept of material assistance does not require that the information could lead to exoneration. Materially helpful evidence "may establish an 'imperfect defense,' a lesser included offense, a lesser related offense, or a lesser degree of the same crime; [or] impeach the credibility of a prosecution witness …. A criminal defendant's constitutional right to a fair trial includes these aspects of his defense." (*Delaney*, *supra*, 50 Cal.3d at p. 809.)

"If the defendant overcomes this threshold showing, the court then balances four factors to evaluate disclosure, including: (1) whether the unpublished information is confidential or sensitive; (2) whether the interests sought to be protected by the shield law will be thwarted by disclosure; (3) the importance of the information to the defendant; and (4) whether there is an alternative source for the information." (*People v. Parker*, *supra*, 13 Cal.5th at pp. 33–34.)

## B. Standard of Review

"We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard." (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) The denial of a motion to quash, like other discovery orders, is reviewed for abuse of

discretion.  (*Facebook*, *Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 359.)  Accordingly, the same standard governs review of a "trial court's application of the shield laws."  (*People v. Parker*, *supra*, 13 Cal.5th at p. 33; see, e.g., *People v. Von Villas* (1992) 10 Cal.App.4th 201, 232.)

In its petition, the Newspaper relies on *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423 to argue for de novo review.  There, however, the "controversy turn[ed] on questions of statutory interpretation."  (*Id*. at p. 1456; see *Christensen v. Lightbourne* (2019) 7 Cal.5th 761, 771 ["We review questions of statutory interpretation de novo"].)  Resolution of the present matter does not require statutory interpretation.  Furthermore, *O'Grady* did not arise from a criminal prosecution and thus did not involve the *Delaney* test for determining whether shield law immunity must yield to a criminal defendant's constitutional rights.

In its reply to Roberts's return, the Newspaper contends different standards of review should apply depending on whether the issue is presented in a writ proceeding or on direct appeal from a judgment of conviction.  The Newspaper again cites to *O'Grady v. Superior Court*, *supra*, 139 Cal.App.4th at page 1456, which is not supportive.  The Newspaper also purports to rely on *Delaney*, but there the California Supreme Court declined to decide the applicable standard of review.  (*Delaney*, *supra*, 50 Cal.3d at p. 816 ["We need not and do not decide the issue"].)

In *People v. Ramos* (2004) 34 Cal.4th 494, a criminal defendant's shield law claim was framed in terms of whether the trial court "abused its discretion in failing to require [a reporter] to produce his interview notes."  (*Id.* at p. 525.)  In *Parker*, the California Supreme Court cited *Ramos* in support of the following statement: "We review for abuse of discretion the trial court's application of the shield laws."  (*People v. Parker*, *supra*, 13 Cal.5th at p. 33.)  We may not simply disregard the high court's plain statement of the law.  (See *Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

A ruling based on an error of law constitutes an abuse of discretion, and the existence of legal error is determined by independent review. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311; *Bisno v. Douglas Emmett Realty Fund 1988* (2009) 174 Cal.App.4th 1534, 1550.) However, *Delaney*'s two-stage inquiry is predominately factual, and the balancing of a criminal defendant's rights against the protections of the shield law is inherently discretionary. As such, the "relative weight of [the *Delaney*] factors in a particular case is for the trial court to decide." (*People v. Charles* (2015) 61 Cal.4th 308, 325, citing *Delaney*, *supra*, 50 Cal.3d at p. 813.)

"A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'" (*Sargon Enterprises*, *Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773; see *People v. Kipp* (1998) 18 Cal.4th 349, 371 ["A court abuses its discretion when its ruling 'falls outside the bounds of reason'"].) "Where there is a basis for the trial court's ruling and it is supported by the evidence, a reviewing court will not substitute its opinion for that of the trial court." (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1612.) This does not mean, however, that we are bound by the superior court's stated reasoning or lack thereof. "Generally, 'we will affirm a judgment or order if it is correct on any theory of law applicable to the case, even if it is right for the wrong reasons.'" (*Cape Concord Homeowners Assn. v. City of Escondido* (2017) 7 Cal.App.5th 180, 193; accord, *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)

### C.     Pertinent Case Law

Prior to *Delaney*, the California Supreme Court had "never determined the substantive scope" of the shield law, nor had it ever "decided a case involving the application of the shield law in a criminal prosecution." (*Delaney*, *supra*, 50 Cal.3d at pp. 803, 805.) The seminal decision arose from a prosecution for misdemeanor possession of brass knuckles. (*Id*. at p. 793.) The defendant, Sean Patrick Delaney, had

been sitting on a mall bench when he was contacted by a group of police officers. Also present were two reporters from the Los Angeles Times who were gathering information for an article on the Long Beach Police Department. (*Ibid*.)

According to the officers, Delaney consented to a search that resulted in the discovery of brass knuckles. (*Delaney*, *supra*, 50 Cal.3d at p. 793.) The defense moved to suppress the evidence, and the reporters were subpoenaed to testify at the motion hearing. "Their testimony established that each of them observed the events leading to the seizure and that each was situated in a position to observe whether Delaney had consented to the search of his jacket," but they "refused to answer any questions relating to whether Delaney had consented." (*Id*. at p. 794.) Both reporters were cited for contempt. (*Ibid*.)

The California Supreme Court held "that the reporters' observations of the police search [constituted] 'unpublished information' within the scope of [the shield law]." (*Delaney*, *supra*, 50 Cal.3d at p. 805.) However, it also concluded "Delaney was clearly entitled to the reporters' testimony as to whether he consented to the police search of his jacket." (*Id*. at p. 814.) As we have discussed, the decision established the following principles:

> "In order to compel disclosure of information covered by the shield law, the defendant must make a threshold showing of a reasonable possibility that the information will materially assist his defense. The showing need not be detailed or specific, but it must rest on more than mere speculation. [Citation.] If the threshold showing is made, the court then balances various factors in determining whether to compel disclosure of the information." (*People v. Cooper* (1991) 53 Cal.3d 771, 820, citing *Delaney*, at pp. 808–813.)

The facts of *Delaney* were such that the defendant easily "met and surpassed the required threshold showing." (*Delaney*, *supra*, 50 Cal.3d at p. 815.) Consequently, *Delaney* offers little guidance on how to differentiate between "mere speculation" and a nonspecific showing that still adequately demonstrates a "reasonable possibility" the

information sought will be materially helpful.  There are few published decisions on the issue, and none factually analogous to this case, but the following authorities do provide some insight.  As will be seen, in camera proceedings can resolve the problem of having to guess what the unpublished information may or may not reveal.  Where defendants often have difficulty is in showing that the prospect of the information making a difference in their case is not entirely speculative.

### 1. *People v. Von Villas, supra, 10 Cal.App.4th 201 (Von Villas)*

In *Von Villas*, two police officers were charged with numerous crimes including attempted murder and conspiracy to commit murder.  A "key prosecution witness," referred to throughout the opinion as "Mr. Adams," had cooperated with investigators to help build a case against the defendants.  (*Von Villas*, *supra*, 10 Cal.App.4th at pp. 229, 222-224.)  Mr. Adams also provided "certain materials, including notes and audiotapes," to a journalist who wrote two magazine articles about the defendants' crimes and other police corruption.  (*Id*. at pp. 228-230.)

The *Von Villas* defendants attempted to obtain from the journalist, through a subpoena duces tecum, "all unpublished information acquired by [the journalist] in the preparation of both articles."  (*Von Villas*, *supra*, 10 Cal.App.4th at p. 229.)  The journalist invoked the shield law in a motion to quash the subpoena.  In response, the defendants "claimed that their rights to a fair trial, particularly their rights to obtain discovery of prior statements of Mr. Adams that might be appropriate material for impeachment as prior inconsistent statements, would be violated if they were denied access to the notes and tapes."  (*Ibid*.)  The defense attorneys "were denied their request to review [the journalist's] materials in camera with the court, but the trial court, [the journalist], and his counsel did review [most of the] materials in camera to determine whether or not discovery of the materials was warranted."  (*Id*. at p. 230.)

Following the in camera review, express findings were made that some of the material was irrelevant and the rest was devoid of any impeachment value. The trial court also found "there was nothing in the tapes qualifying as an inconsistent statement by Mr. Adams not already made available to [the defendants] from the record." (*Von Villas*, *supra*, 10 Cal.App.4th at p. 230.) The journalist's motion to quash was granted, and the ruling was upheld on appeal. The appellate court reasoned, "Since the sole objective of [the defendants] was to acquire material to impeach Mr. Adams, the trial judge appropriately granted the motion to quash." (*Id*. at p. 235.)

### 2. *People v. Sanchez (1995) 12 Cal.4th 1 (Sanchez)*

The *Sanchez* defendant participated in a double murder and a separate third murder. (*Sanchez*, *supra*, 12 Cal.4th at pp. 17–19.) It was a capital case, and he was sentenced to death. After his arrest but prior to trial, the defendant made incriminating statements to a cellmate, a police investigator (Investigator Stratton), a homicide detective (Detective Boggs), and a newspaper reporter. (*Id*. at pp. 19–21.)

The *Sanchez* defendant admitted culpability to the cellmate and to Detective Boggs. (*Sanchez*, *supra*, 12 Cal.4th at pp. 20–21.) In his statements to Investigator Stratton, he placed himself in the vicinity of the double murder but did not admit guilt. However, his statement to Investigator Stratton conflicted with details he had shared with the cellmate. (*Id*. at p. 20.) The defendant spoke to the newspaper reporter on five separate occasions, and the reporter wrote several published articles based on their conversations. (*Sanchez*, *supra*, 12 Cal.4th at pp. 21, 48–49)

One of the earlier articles "reported that defendant 'did not actually kill' [the double homicide victims] but felt 'he deserves to die because he was present when the slaying happened, because he helped the killers and because he didn't intervene to save the couple ….'" (*Sanchez*, *supra*, 12 Cal.4th at p. 49.) The defendant was quoted as describing how one of the killers had stabbed the female victim, and of accusing another

alleged perpetrator of beating the male victim. "The article also stated that defendant told [the reporter] 'they all had been smoking PCP' before committing the crimes." The defendant had allegedly denied murdering anybody and, in reference to the third homicide, claimed he was """"not guilty of that.""" (*Ibid.*)

In a later article entitled "*Accused Asks for Own Death*, *System Says No*," the reporter wrote, "'[The defendant] says he's a murderer, a triple murderer,' and that all three victims 'were killed for their social security checks.'" (*Sanchez*, *supra*, 12 Cal.4th at p. 48.) The statement of motive was relevant to multiple robbery counts and robbery-murder special-circumstance allegations. (*Id.* at pp. 17, 58.) "The article also revealed defendant's feelings of guilt: 'I am not an innocent man. If a man feels guilty he should be allowed to plead guilty, … I should go straight to the gas chamber.'" (*Id.* at pp. 48–49.)

The defendant waived his right to a jury for the guilt phase. He also "moved to submit the guilt and special circumstance phases on the preliminary hearing transcript." (*Sanchez*, *supra*, 12 Cal.4th at p. 23.) The motion was "a compromise made by defendant at [his attorney's] request. Defendant originally had wanted to plead guilty to the capital charges, but [his attorney] would not consent to such a plea, believing that a guilty plea would amount to ineffective assistance of counsel." (*Id.* at p. 24.)

The prosecution supplemented the preliminary hearing evidence with testimony from the newspaper reporter. The reporter's motion to quash a trial subpoena was denied "[a]fter the prosecutor assured the court she intended to limit questioning of [the reporter] to published statements" in the "*Accused Asks for Own Death …*" article. (*Sanchez*, *supra*, 12 Cal.4th at p. 49.) On direct examination, the reporter testified "that defendant told him he was 'a triple murderer' and that 'all three [victims] were killed for their social security checks.'" (*Id.* at p. 50.)

"Defense counsel moved the court either to strike [the reporter's] testimony or to order [the reporter] to furnish defendant with all unpublished information regarding the

31.

interviews." (*Sanchez*, *supra*, 12 Cal.4th at p. 50.)  The defense "argued that application of the shield law to protect unpublished information in [the reporter's] possession would deny [the defendant] his Fifth Amendment right against self-incrimination, and his Sixth Amendment rights to confrontation and to the effective assistance of counsel." (*Ibid*.) The trial court allowed the defense to cross-examine on "'any published article.'" (*Ibid*.) In other words, the reporter could be asked about the defendant previously saying he was not guilty and *not* a murderer.  However, the request for unpublished material was denied. (*Id*. at pp. 49–51.)

In his automatic appeal, the defendant claimed to have "met *Delaney*'s threshold test for defeating a claim for immunity." (*Sanchez*, *supra*, 12 Cal.4th at p. 54.)  "In attempting to meet his burden, defendant attack[ed] his own credibility by claiming he made inconsistent statements during the course of the interviews that would have exposed his confused state of mind at the time the interviews took place." (*Id*. at p. 57.)  Among other contentions, he argued evidence of his unpublished interview statements "could have been used to impeach [the reporter's] testimony that defendant had told him he was a 'triple murderer' and that 'all three were killed for their social security checks.'" (*Ibid*.) Put differently, "'[the reporter's] unpublished material might have shown that his "triple murder" testimony was his own interpretation of [the defendant's] account, not an actual admission.'" (*Ibid*.)

The *Sanchez* court rejected the defendant's claim.  The opinion notes his failure to show "how the information he sought would materially assist his defense, or how it differed in content from the testimony and published information available for cross-examination, including defendant's statements that he was scared, that he had taken phencyclidine (PCP), *and that he had not murdered anyone*." (*Sanchez*, *supra*, 12 Cal.4th at p. 57, italics added.)  Based on the defendant's explanation of what he had hoped to obtain, the high court described the unpublished material as "consist[ing] of nothing more than self-serving statements that a court could reasonably conclude were

32.

either too speculative to assist defendant or would harm, rather than materially assist, the defense." (*Ibid.*, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

We observe that the "speculative" showing was deficient not with regard to the content of the unpublished material, but as to the possibility of it providing material assistance to the defendant's case. (*Sanchez*, *supra*, 12 Cal.4th at p. 57.) Furthermore, considering the questions of guilt were decided in a bench trial, the judge ruling on the threshold requirement had unique and especially keen insight into the potential value of any impeachment evidence. Elsewhere in the *Sanchez* opinion, it is noted that the trial court ultimately "rejected [the reporter's] statements as proof that defendant killed the victims for their Social Security checks. Moreover, the court found untrue the special circumstance allegations that the [double] murders … were committed during a robbery and found defendant not guilty of the robbery in connection with that crime. Thus, it appears the court afforded little weight to [the reporter's] testimony." (*Id*. at p. 58.)

### 3.     *People v. Ramos, supra, 34 Cal.4th 494 (Ramos)*

The *Ramos* defendant pleaded guilty to multiple murders. The only issue at trial was his punishment. A defense expert testified the defendant suffered "from a paranoid personality disorder due to the influence of several factors, including an abusive childhood and time spent fighting in Vietnam as a soldier during the Vietnam War." (*Ramos*, *supra*, 34 Cal.4th at p. 504.) However, the expert "noted that defendant's disorder does not mean that he is insane or that he does not appreciate the gravity of his acts; indeed, defendant knows what he is doing." (*Ibid*.) The jury returned a verdict of death. (*Id*. at p. 502.)

The defendant was previously interviewed by a newspaper reporter, and the reporter had written a published article entitled, "*I'll Get Death Penalty*." (*Ramos*, *supra*, 34 Cal.4th at p. 523.) The article quoted the defendant as saying, """I figure I'll get the

death penalty. I knew that before any of this happened. But like I said, I weighed all that before I did anything."'" (*Ibid.*)

"Prior to the penalty trial, the prosecution subpoenaed [the reporter] as a witness. [The reporter] and the newspaper filed a motion to quash the subpoena, on the ground that the information the prosecution sought was protected by the California shield law." (*Ramos*, *supra*, 34 Cal.4th at p. 523.) After clarification from the prosecutor that no questions would be asked about unpublished material, the trial court tentatively ruled to deny the motion. (*Id*. at pp. 523–524.) When the reporter claimed he was unable to recall "exactly what defendant told him during the interview," defense counsel objected based on the defendant's "cross-examination rights." (*Id*. at p. 524.)

The trial court in *Ramos* conducted two in camera hearings. The first was with the defendant and his attorney "in order to explore what would assist in defendant's cross-examination." (*Ramos*, *supra*, 34 Cal.4th at p. 524.) The defense specified it was seeking the reporter's notes and "'(1) The context of [defendant's] statements; (2) the flow of conversation; (3) the specific words [defendant] used; (4) the intensity of [defendant's] voice; (5) how long [defendant] spoke about matters which in his mind justified his action without interruption; (6) whether [defendant] presented his justifications logically; and (7) whether [defendant] evidenced a strong belief in what he was saying.'" (*Ibid.*)

The second in camera hearing was attended by the reporter and his attorneys, the prosecutor, and defense counsel. (*Ramos*, *supra*, 34 Cal.4th at p. 524.) "During the hearing, [the reporter] indicated he had no independent recollection of the interview, except the information provided in his notes. The notes indicated that defendant made the reported statements …, appeared calm and spoke in a monotone, discussed very seriously his life philosophy, did not appear delusional, presented his arguments logically, and believed what he was saying." (*Ibid*.) The trial court declined to order production of the notes, but it allowed cross-examination on the reporter's "observations

34.

of defendant's demeanor, mental status, and the manner in which defendant answered questions." (*Ibid*.)

The reporter's trial testimony alleged the defendant had said, "'I consider everything before I do it. I weigh all the angles, make my decision and I go ahead and do it.'" (*Ramos*, *supra*, 34 Cal.4th at p. 525.) On cross-examination, the reporter "testified that throughout the interview, defendant spoke in a stern voice and was calm, and that at times his eyes stared intently through the glass." The defendant's psychiatric expert was later asked about the reporter's testimony, and the expert testified it did not change his diagnosis. (*Ibid*.)

In his automatic appeal, the *Ramos* defendant claimed the trial court abused its discretion by allowing the reporter to withhold his interview notes and by limiting the scope of cross-examination "to describing defendant's demeanor and perceived mental state." (*Ramos*, *supra*, 34 Cal.4th at p. 525.) The California Supreme Court gave the following reasons for rejecting the claim:

> "The evidence defendant asserts would have materially assisted his mental state defense consists of nothing more than mere speculation on his part. Defendant has made no attempt to show that the notes reveal anything different from [the reporter's] testimony, and the record does not suggest the notes contain anything of substance that the jury had not already heard. *In addition*, *the only matters in the notes to which [the reporter] did not testify* (*whether defendant was promised confidentiality and the interview's duration*) *do not bear on defendant's mental state at the time of the murders*. [The defendant's psychiatrist] did testify that nothing in [the reporter's] testimony changed or contradicted his diagnosis of paranoid personality. But defendant has failed to meet *Delaney*'s threshold test, and we find no abuse of discretion in the trial court's use of the shield law in protecting [the] notes." (*Ramos*, at p. 527, italics added.)

### 4. *People v. Vasco (2005) 131 Cal.App.4th 137 (Vasco)*

Adriana Vasco was the "former mistress and long-time confidante" of a "prominent Huntington Beach osteopathic physician." (*Vasco*, *supra*, 131 Cal.App.4th at p. 142.) The doctor had long wished to be rid of his wife but "feared a divorce would

financially ruin him." (*Id*. at pp. 145, 143.) Sometime after Vasco's affair with the doctor had ended, she learned her new boyfriend (the hitman) "had experience as a hired assailant." (*Id*. at p. 142.) Vasco put the men in touch with each other, and arrangements were made for the wife to be murdered. In a "Shakespearean" turn of events, the hitman killed both the unsuspecting wife and her perfidious husband. (*Ibid*.) Vasco was prosecuted for her role in the murders and sentenced to life without the possibility of parole (LWOP).

Vasco gave a jailhouse interview to a reporter from the Orange County Register, "and excerpts from that interview were subsequently published in the newspaper the following day. The published material included either a paraphrased account by [the reporter] or defendant's direct quotations." (*Vasco*, *supra*, 131 Cal.App.4th at p. 145.) The article portrayed Vasco as someone who believed in her innocence but also felt bad about what happened. Vasco "claimed she had nothing to do with the killings and could not stop them, because [the doctor] was obsessed with killing his wife and [the hitman] threatened to kill her if she interfered." (*Ibid*.)

In a familiar sequence of events, the prosecutor subpoenaed the reporter to testify at trial and the reporter filed a motion to quash. "The trial court denied the motion to quash but preliminarily limited any inquiry to published information only. The court reserved ruling on whether defendant could ask [the reporter] about unpublished information protected under the shield law." (*Vasco*, *supra*, 131 Cal.App.4th at p. 149.) Following an "extensive pretrial hearing," the trial court ruled to prohibit cross-examination on any unpublished material. (*Ibid*.)

These excerpts from the appellate court decision summarize Vasco's arguments and why she failed to meet *Delaney*'s threshold requirement:

> "As in *Sanchez*, defendant complains the reporter paraphrased her statements, and argues cross-examination would have revealed her exact statements, which, in turn, might have bolstered her lack of intent defense. She argues disclosure of any notes or tape-recorded interview of defendant

36.

may have revealed her exact statements. She also asserts cross-examining [the reporter] about her demeanor would have corroborated defendant's fear of [the hitman] and the description of his threats [against her]. She surmises cross-examination may have revealed [the reporter] used other information sources besides defendant. Finally, she argues cross-examination may have shown [the reporter] coerced her into making involuntary admissions. [¶] … [¶]

"Defendant's assertions parrot those the defendants lodged in *Sanchez* and *Ramos*, and amount to nothing more than rank speculation. Much of the information she sought to elicit was cumulative of other admitted evidence. [The reporter] recounted defendant's statements describing her fear of [the hitman] and his violent conduct. Other witnesses corroborated [the hitman's] violent character, and defendant's expert explained her battered women's syndrome defense. *Defendant never claimed [the reporter's] account of his interview with her was untruthful or inaccurate*. Thus, defendant's argument, stripped of its gloss, is merely a request to elicit additional corroborating information …. As in *Sanchez*, defendant failed to explain how this information would have assisted her defense, or how it differed from other mitigating evidence presented at trial. Finally, we note defendant filed no declarations or investigative reports to support her *Delaney* showing." (*Vasco*, *supra*, 131 Cal.App.4th at p. 155, italics added.)

### 5.    *People v. Frederickson, supra, 8 Cal.5th 963 (Frederickson)*

The capital defendant in *Frederickson* admitted his guilt to numerous people. Within hours of killing an employee inside of a crowded store, the defendant called the establishment and said over the phone, "'You need to tell your employees that money is not worth getting killed over. [¶] … [¶] … He didn't do what I told him. Do you understand?' … 'While I pointed the gun at him and told him to put the money in the bag, he just started counting the money. I told him not to count the [expletive] money. I told him to put the money in the box. He just closed the safe and started walking away. … I got mad, flustrated [*sic*], so I shot him.'" (*Frederickson*, *supra*, 8 Cal.5th at p. 971.) The defendant thought he was speaking to a store employee, but the person on the phone was a police officer. (*Ibid*.)

Following his arrest, the *Frederickson* defendant waived his right to remain silent and again confessed to killing the victim during an attempted robbery. (*Frederickson*, *supra*, 8 Cal.5th at pp. 971–972.) He also admitted to making the phone call described above. (*Id.* at p. 972.) The day after his custodial interrogation, the defendant granted an interview to a newspaper reporter. During the interview, he again "admitted that he was attempting to rob the store and shot [the victim] during the attempt." (*Ibid.*) The Orange County Register (Register) published an article based on his statements. (*Id.* at p. 1014.)

Trial was separated into guilt, insanity, and penalty phases. The defendant represented himself at the guilt phase but had advisory counsel for the insanity and penalty phases. He was convicted of special circumstance murder and was found to have been sane at the time of the offense. The jury returned a verdict of death. (*Frederickson*, *supra*, 8 Cal.5th at pp. 970, 973–974, 976.) The procedural history of the shield law issue was as follows:

> "The prosecution subpoenaed [the reporter] to testify at trial. Defendant in turn subpoenaed the Register for any notes and materials it had regarding [the reporter's] interview. The Register provided a copy of the published article. After defendant argued that the Register wanted to 'quash the unpublished' notes, the trial court issued an order to show cause why the Register should not produce the requested documents. In response, the Register, on its own behalf and on behalf of [the reporter], moved for a protective order limiting the scope of subpoenas to information not protected under the California reporter's shield law and also the First Amendment to the United States Constitution. Defendant opposed the motion, arguing that statements he made during the interview would establish mitigating circumstances relative to the penalty determination, might establish that the murder was not in furtherance of a robbery, and might be relevant for the sanity phase. He further argued that [the reporter] published his statements out of context, and he needed the ability to impeach her credibility and to show that she was acting as a government agent." (*Frederickson*, at p. 1014.)

The trial court ruled "that defendant could cross-examine [the reporter] regarding the circumstances surrounding the interview, *including statements he may have made that*

*were not published.*  The court also concluded, however, that it would not order [the reporter] to turn over her notes at that time, stating that making such an order would depend on her testimony and whether she relied on those notes in refreshing her recollection while testifying." (*Frederickson*, *supra*, 8 Cal.5th at p. 1014, italics added.) The reporter never confirmed the existence of any notes, and she testified to refreshing her recollection "by reviewing the published newspaper article and watching a videotape of a televised interview."  In light of her testimony, the court ruled that any notes were protected from disclosure by the shield law. (*Id*. at pp. 1014–1015.)

In his automatic appeal, the *Frederickson* defendant complained of his inability to obtain the reporter's notes.  The California Supreme Court rejected the claim for failure to satisfy *Delaney*'s threshold requirement:

> "[H]e has not established that such notes even existed.  Although he asserted in his motion that he had been misquoted in various passages of the article, the statements attributed to him in the article were consistent with his statements to the investigators.  Defendant's vague assertion that he needed the notes to 'test her credibility' does not show a reasonable possibility that the notes would have materially assisted his defense.  He has not made an adequate showing that any notes made by [the reporter] contained anything different from her testimony or from what the jury had already heard.  [¶] Further, the trial court permitted defendant to cross-examine [the reporter] on 'all of the circumstances' surrounding the interview, including statements defendant may have made that were not published.  As the court told defendant during the hearing, 'Considering the interview was of you, I think there is significant areas of testing the credibility available to you.'" (*Frederickson*, *supra*, 8 Cal.5th at p. 1016.)

## D.      Analysis

### 1.      *Roberts's Threshold Burden*

It was Roberts's burden to show a "*reasonable possibility*" the reporter's notes from her interview with Parra contain information materially helpful to Roberts's defense. (*Delaney*, *supra*, 50 Cal.3d at p. 808.)  Although Roberts's attorney is unwilling to disclose the finer points of the anticipated defense case, key aspects are readily

inferable from our record. Again, we note the superior court took judicial notice of the preliminary hearing transcript.

The People's evidence puts Roberts at the crime scene when the shooting occurred. His basic defense is that Parra was the shooter and Parra has "falsely accused" him of committing the charged offenses. Evidence tending to show (1) Parra killed the victim with his own nine-millimeter firearm, (2) Roberts never had possession of Parra's gun, and/or (3) Parra lied about Roberts making statements suggestive of attempted robbery, could all materially assist Roberts in defending against the charges. Such evidence need not have the potential to fully exonerate him. It would be enough if it could help him avoid being convicted of unlawfully possessing a firearm (count 3) or a true finding on the firearm enhancement allegation. (See *Delaney*, *supra*, 50 Cal.3d at p. 809.)

Roberts must also overcome the ostensible admission of guilt in the text message sent from his phone. Although his briefing avoids disclosing strategy on this topic, the record strongly implies that Roberts is accusing Parra of sending the "I just killed somebody" message from Roberts's phone. Evidence supportive of this theory, even if only to impeach Parra's prior testimony on the subject, could materially assist Roberts.

It is reasonably possible the reporter's notes reflect unpublished statements by Parra concerning pivotal elements of Roberts's defense case. The conclusion rests on more than "mere speculation." (*Delaney*, *supra*, 50 Cal.3d at p. 809.) One paragraph from the article states, "Police also said a phone number associated with Roberts sent a text message saying 'I just killed someone' and to turn on the news. Parra denied to a reporter ever physically touching Roberts' phone, and only looked at it for 30 seconds while trying to get on a Wi-Fi hot spot." The quoted excerpt all but confirms the reporter talked to Parra about the text message.

The article indicates the theory of Parra being the shooter was also discussed. Such conversations are implied by these excerpts:

40.

- "A theory may explain why Parra was arrested, he told a reporter—what gun killed [the victim]?"

- "[Parra] lived at The Park at River Walk and was on his way to the restroom when he was stopped by Roberts, Parra told The Californian."

- "Parra recalled to The Californian leaving his backpack behind when walking to the restroom and first running into Roberts. The backpack is where the gun was stored, Parra said, theorizing that's how Roberts could have gotten a gun. [¶] … He also said he didn't kill [the victim] and carried a gun because he was living on the streets."

- "After the preliminary hearing, Parra told a reporter he was interviewed again by police. That's when officers asked him about the gun, and Parra said he admitted to police he carried a gun with him and it wasn't at his friend's house."

The superior court was within its discretion to conclude it is reasonably possible the reporters' notes reflect unpublished statements by Parra that could materially assist Roberts at trial. Here again, the conclusion is not entirely speculative. One reason is because many of the published statements attributed to Parra directly contradict his preliminary hearing testimony. For example, Parra testified he did not possess his nine-millimeter firearm on the day of the shooting because "I didn't want to have it with me on the streets." According to the article, Parra told the reporter he *did* have his gun that day and "carried a gun *because* he was living on the streets." (Italics added.) The article also speaks of Parra "theorizing" his nine-millimeter firearm was used to kill the victim, but he previously testified his gun was *not* used in the shooting.

Another example is Parra's testimony on direct and cross-examination that Roberts was with him when he fell asleep but gone when he woke up. According to the article, Parra told the reporter that "he walked away from Roberts later that night, after Roberts had fallen asleep." Given Parra's history of changing his story every time he tells it, with new details and in ways that cast doubt over his accusations against Roberts,

41.

there is a likelihood he made unpublished statements with similar evidentiary value to the defense as those contained in the article.

To be clear, our analysis distinguishes between the impeachment value of the published statements and the reasonable possibility of additional, materially helpful content in the unpublished material. The article introduces a new theory reportedly advanced by Parra that Roberts removed a nine-millimeter firearm from Parra's backpack without Parra's knowledge. However, Parra was asked on cross-examination to confirm that "from the moment [he] saw [Roberts]," the two of them "stayed together throughout the rest of the night, including walking over to the Walmart area on Rosedale." Parra answered the question affirmatively. Considering his prior testimony, Parra's statements about first encountering Roberts near a restroom are significant, and it is reasonably possible he made additional unpublished statements on the subject that have impeachment value.

When questioned by detectives, Parra told conflicting stories about whether he first spoke to Roberts before or after using a bathroom near an amphitheater in the park. In one version, he first noticed Roberts sitting near a water fountain on the opposite side of a fence. Parra later testified Roberts stopped him while he (Parra) was on his way to the bathroom, at which point they "started talking for a bit [and] hung out a little bit." The prosecutor asked, "Did you, prior to hanging out with him …, actually use the restroom?" Parra answered, "Um, I don't remember. I think I did end up going to the bathroom in the park."

The article reports Parra "was on his way to the restroom when he was stopped by Roberts." Several paragraphs later, it ambiguously contends he recalled "leaving his backpack behind when walking to the restroom and first running into Roberts." The reader can only guess where Parra claimed to have left the backpack, when that occurred in relation to meeting Roberts, and what opportunity Roberts allegedly had to steal the gun. It is reasonably possible there is unpublished material clarifying what Parra told the

42.

reporter, and those statements could assist Roberts in convincing a jury he did not surreptitiously remove a firearm from Parra's backpack.

The "I just killed somebody" text message was sent at 10:54 p.m. Parra testified to leaving work at 4:30 p.m. and first encountering Roberts around 5:00 p.m. or 5:30 p.m. However, Parra also said Roberts already had the 12-pack of alcoholic beverages when they met, and the video evidence put the time of that purchase between 5:15 p.m. and 5:55 p.m. These times are important in relation to any unpublished statements Parra may have made about Roberts's phone.

During the preliminary hearing, Roberts's attorney questioned a police witness about Roberts's phone records. Counsel asked the witness about a "large gap in call and text message usage" preceding the "I just killed somebody" message, and the witness confirmed an estimated gap of six hours. In other words, the records reportedly showed no texts or calls between approximately 4:53 p.m. and 10:53 p.m. Parra has already made conflicting statements about whether he saw Roberts talking on the phone between approximately 5:30 p.m. and 6:00 p.m. He also testified to seeing Roberts texting early in the night. If the subpoenaed material shows Parra made unpublished statements about Roberts texting or talking on his phone at other times, it could provide additional and potentially stronger impeachment evidence on this topic.

Parra's statement to the reporter about having "walked away from Roberts later that night, after Roberts had fallen asleep," indicates Parra was awake and with Roberts while Roberts was sleeping. This could explain how Parra might have gained access to Roberts's phone and sent the "I just killed somebody" text message without Roberts's knowledge. In any event, Roberts's defense could materially benefit from any evidence showing he and Parra were together at or near 10:54 p.m. Parra has vaguely testified to separating from Roberts sometime prior to 12:00 a.m. or 1:00 a.m. It is reasonably possible the reporter's notes indicate Parra made unpublished statements indicative of

how long he and Roberts were together after the shooting and when he finally "walked away from Roberts."

At the preliminary hearing, Roberts's counsel made a deliberate effort to establish when Parra and Roberts were together at the Yard House restaurant. Parra's testimony (and other evidence) place them there sometime between approximately 8:45 p.m. and 9:30 p.m. Parra estimated it took them 30 to 45 minutes to walk to Walmart, where they both allegedly fell asleep, but the reliability of his estimate was never established. Any unpublished statements by Parra concerning his activities between the time of the shooting (8:26 p.m.) and the text message (10:54 p.m.) could help Roberts's defense case. According to the article, Parra denied "ever physically touching Roberts' phone" but also said he "looked at it for 30 seconds while trying to get on a Wi-Fi hotspot." The reporter's notes may clarify what the latter statement means or indicate when and where the event occurred.

The Newspaper's arguments concerning Roberts's threshold burden either misstate or misconstrue the case law. The California Supreme Court has repeatedly said the required showing "'need not be detailed or specific.'" (E.g., *People v. Parker*, *supra*, 13 Cal.5th at p. 33, quoting *Delaney*, *supra*, 50 Cal.3d at p. 809.) Yet the Newspaper asserts "the defendant must make a *specific* showing as to how the unpublished information will 'materially' assist his defense." The Newspaper purports to rely on *In re Willon*, *supra*, 47 Cal.App.4th 1080.

We have cited *Willon* for its helpful discussion of the shield law's history. (*In re Willon*, *supra*, 47 Cal.App.4th at pp. 1090–1091.) However, *Willon* articulates a test for use only in one scenario: where a newsperson refuses to identify the source of leaks to the press occurring in violation of a "'gag'" order issued in a criminal prosecution. (*Id*. at pp. 1084–1085.) The opinion states, "Unlike *Delaney*, we are not confronted with a request by a defendant for information that would directly assist in his or her defense; here it is the trial court that seeks disclosure in order to preserve its ability to control the

44.

judicial process and maintain an unbiased jury pool.…  We thus agree with the parties that *the threshold showing and balancing test formulated in* Delaney *are not controlling here*."  (*Willon*, at p. 1093, italics added, fn. omitted.)

The *Willon* opinion holds "that the shield law protects the news media from contempt absent a specific showing that nondisclosure *of the source* will create a substantial probability of injury to the criminal defendant's right to a fair trial."  (*In re Willon*, *supra*, 47 Cal.App.4th at p. 1085, italics added.)  The Newspaper's briefing quotes this language three separate times, but with an ellipsis in place of the words "of the source" and fails to acknowledge the contextual distinction.  It is quite clear *Willon* does not support the Newspaper's argument that Roberts needed to make a "*specific* showing" of how the subpoenaed material will assist his defense.

Next, the Newspaper dismisses as "dicta" the statement in *Delaney* that impeaching a prosecution witness is both materially assistive and an aspect of a criminal defense case that is embodied in the right to a fair trial.  (*Delaney*, *supra*, 50 Cal.3d at p. 809.)  According to the Newspaper, "no court has ever found that potential impeachment is sufficient to meet *Delaney*'s threshold burden."  Moreover, it claims *Frederickson*, *Sanchez*, and *Von Villas* collectively demonstrate it is "well established that the possibility that unpublished news material might uncover impeachment information is an insufficient basis to support a criminal defendant's threshold burden."  These arguments fail.

Impeachment is the process of calling into question a witness's credibility and/or the believability of their testimony.  (*People v. Sam* (1969) 71 Cal.2d 194, 208; *Gallo v. Peninsula Hospital* (1985) 164 Cal.App.3d 899, 904; see Evid. Code, § 780, subd. (e); *People v. Turner* (2017) 13 Cal.App.5th 397, 410.)  To say "no court has ever found that potential impeachment is sufficient to meet *Delaney*'s threshold burden" is to overlook the facts of *Delaney* itself.  "According to the [arresting] officers," Sean Patrick Delaney was asked for permission to search his jacket and he consented.  (*Delaney*, *supra*, 50

Cal.3d at p. 793.)  "Following testimony by the officers at the suppression hearing, the reporters were called to testify by the prosecution to demonstrate the legality of the seizure [of what the search produced]." (*Id*. at p. 794.)  The reporters were not the only other people who knew whether the search was consensual.  But as between them and "Delaney's companion, who was present at the time of the search, and four other officers who might have been within hearing distance of the search," the reporters were the only disinterested witnesses.  (*Id*. at p. 815.)  The reason why it was reasonably possible the reporters' unpublished information would materially assist Delaney was because of its potential impeachment value.  (See *id*. at pp. 814–815.)

In *Von Villas*, the trial judge conducted in camera proceedings.  (*Von Villas*, *supra*, 10 Cal.App.4th at p. 230.)  The judge "was intimately familiar with the facts of the case" and "had carefully reviewed the unpublished information" before ruling on whether to order production of the material.  (*Id*. at p. 235.)  The *Von Villas* defendants did not fail to meet their threshold burden because they were seeking impeachment evidence; it was because the unpublished material was found to have no impeachment value.  (*Id*. at pp. 230, 235.)  "Since the sole objective of [the defendants] was to acquire material to impeach [a prosecution witness], the trial judge appropriately granted the motion to quash." (*Id*. at p. 235.)

The *Sanchez* opinion notes "*Delaney* did not and could not specify what evidence would meet its threshold test." (*Sanchez*, *supra*, 12 Cal.4th at p. 56.)  The opinion then describes the examples provided in *Delaney* as "instructive," including evidence that may "'impeach the credibility of a prosecution witness.'" (*Sanchez*, at pp. 56–57, quoting *Delaney*, *supra*, 50 Cal.3d at p. 809.)  The *Sanchez* defendant made inconsistent statements to a reporter over the course of five interviews and was permitted to cross-examine the reporter about those inconsistencies.  His failure in seeking to obtain the reporter's unpublished notes was *not* because impeachment evidence is categorically insufficient to satisfy the threshold burden.  The defendant's claim on appeal was rejected

46.

because the unpublished material consisted of "nothing more than self-serving statements *that a court could reasonably conclude* were either too speculative to assist defendant or would harm, rather than materially assist, the defense." (*Sanchez*, at p. 57, italics added.)

In *Frederickson*, the defendant was partially successful in overcoming a reporter's shield law immunity. The trial court ruled to allow cross-examination on published and unpublished statements made to the reporter during her interview with the defendant. (*Frederickson*, *supra*, 8 Cal.5th at pp. 1014, 1016.) The issue on appeal concerned unpublished notes that were never even shown to exist. (*Id*. at pp. 1014–1016.) The defendant claimed he was "misquoted in various passages of the article" and made a "vague assertion that he needed the notes to 'test [the reporter's] credibility.'" (*Id*. at p. 1016.) He never explained how the misquotations were substantively inconsistent with what he had told the reporter or with his numerous prior admissions of guilt. Moreover, as the interviewee, he was able to know if anything in the reporter's article or testimony materially conflicted with what he had actually said. (*Ibid*.) As with *Sanchez* and *Von Villas*, the outcome in *Frederickson* was based on the particular facts and circumstances of the case.

The Newspaper further contends Roberts needed to somehow establish the unpublished material is not "cumulative of other evidence already in the record." A few cases discuss the issue of cumulative evidence, e.g., *Ramos* and *Vasco*, but the Newspaper's broad assertion is unfounded. To the extent those cases are marginally supportive of the Newspaper's argument, they are distinguishable.

In *Ramos*, for example, the trial court held two in camera hearings. One was to determine what the defense hoped to glean from a reporter's interview notes, and the other was to determine the content of the notes. (*Ramos*, *supra*, 34 Cal.4th at p. 524.) Here, Roberts's attorney requested an in camera hearing to "thoroughly explain" how the subpoenaed material could materially assist Roberts. The Newspaper opposed the request, arguing that excluding it "from any hearing with defense counsel about the

47.

factual basis for the subpoena is unconstitutional and will severely prejudice the newspaper's rights." The Newspaper went a step further by preemptively objecting to in camera review of the subpoenaed material by the superior court. The superior court did not conduct in camera proceedings, leaving Roberts with no realistic way of knowing whether, or to what extent, the unpublished material is cumulative of evidence "already in the record"—which at this point means the preliminary hearing evidence. Under these circumstances, Roberts cannot be faulted for his inability to show the unpublished material is not unduly cumulative.

The Newspaper also complains of Roberts's failure to "explain why [the Newspaper] would not have published critical statements by [Parra] had he made them." The explanation is rather obvious. What a reporter and her editors see fit to include in an article written for the general public does not necessarily encompass all information an experienced defense attorney would recognize as materially helpful to her client's case. (See *Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1686 ["A trained attorney is more qualified to recognize and analyze legal needs than a lay client"].)

The superior court's ruling on Roberts's threshold showing was not an abuse of discretion. Insofar as reasonable minds could differ on where the dividing line between "reasonable possibility" and "mere speculation" should be drawn under these facts, it only shows the determination was valid. "[T]he circumstance that the trial court arguably could have exercised its discretion differently does not establish that the manner in which it did exercise its discretion falls outside the bounds of reason." (*Meeks v. AutoZone, Inc.* (2018) 24 Cal.App.5th 855, 868; see *Braman v. State of California* (1994) 28 Cal.App.4th 344, 351 ["The very essence of discretion is the power to make 'comparisons, choices, judgments, and evaluations'"].) We cannot say the showing was unduly speculative as a matter of law.

## 2. *The Factor Test*

"By meeting the threshold requirement, a defendant is not necessarily entitled to a newsperson's unpublished information. The trial court must then consider the importance of protecting the unpublished information. [Citation.] This determination may properly be characterized as a balancing of the defendant's and newsperson's respective, perhaps conflicting, interests." (*Delaney*, *supra*, 50 Cal.3d at p. 809.)

The balancing process involves four factors. No one factor or combination of factors is determinative, and "their relative importance will likely vary from case to case." (*Delaney*, *supra*, 50 Cal.3d at p. 813.) We address the criteria under the same headings used in the *Delaney* opinion.

### a. Whether the unpublished information is confidential or sensitive

The Newspaper concedes the unpublished material is not confidential but argues it is "sensitive." Unpublished information is "sensitive" if "its disclosure would somehow unduly restrict the newsperson's access to future sources and information." (*Delaney*, *supra*, 50 Cal.3d at p. 810.) The *Delaney* opinion provides an example of "nonconfidential but sensitive information":

> "Assume a reporter is investigating corruption in city government. He obtains information from a city employee who agrees to be quoted and identified. Even so, disclosure of this information in some circumstances might unduly restrict the reporter's ability to complete the story. If he were forced to disclose the source's identity before the articles were published and the source's employment was terminated as a result, other sources might cease to cooperate. That the information sought is not confidential does not necessarily mean it is not sensitive and equally worthy of protection from disclosure." (*Id*. at p. 810, fn. 25.)

The Newspaper argues information can be sensitive regardless of whether a source's identity is at issue, but it does not explain how the notes from Parra's interview fall into that category. Instead, the Newspaper makes a broad policy argument that compelling the disclosure of *any* unpublished interview notes in *any case* where the

49.

source is a criminal defendant awaiting trial would have a chilling effect on future newsgathering efforts.

The *Delaney* court discussed the first factor in terms of "the information sought," i.e., the specific material at issue. (*Delaney*, *supra*, 50 Cal.3d at p. 810 & fn. 25.) The Newspaper fails to explain how the information sought by Roberts is confidential or sensitive in the way contemplated by *Delaney*. We will address the Newspaper's policy arguments in our discussion of the second factor.

The superior court found the subpoenaed material is neither confidential nor sensitive. The finding is supported by the record, which contains no evidence to support a different conclusion. "Generally, nonconfidential or nonsensitive information will be less worthy of protection than confidential or sensitive information." (*Delaney*, *supra*, 50 Cal.3d at p. 810.) As such, there was a reasonable basis to conclude this factor weighed in favor of disclosure.

### b. The interests sought to be protected by the shield law

In evaluating the second factor, "a trial court must determine whether the policy of the shield law will in fact be thwarted by disclosure." (*Delaney*, *supra*, 50 Cal.3d at p. 811.) There are two related considerations. First is whether the need to avoid disclosure is mooted by the surrounding circumstances. The example provided is if "the criminal defendant seeking disclosure is himself the source of the information, it cannot be seriously argued that the source (the defendant) will feel that his confidence has been breached." (*Id*. at p. 810.) Second is whether compelled disclosure "would impinge on [the subpoenaed party's] future news-gathering ability or other interest." (*Id*. at p. 815.)

The primary purpose of the shield law is to protect a newsperson's "future ability to gather news." (*Delaney*, *supra*, 50 Cal.3d at p. 810.) The Newspaper argues "compelled disclosure would give future criminal defendants a reason to decline to cooperate with journalists." The argument continues: "If codefendants routinely can

50.

obtain material that a journalist chose not to include in an edited report, including notes from interviews, potential sources are likely to refuse to be interviewed at all, to avoid having their unguarded comments become the subject of a fishing expedition into any potential avenue for impeachment." The Newspaper further speculates about the press being dissuaded from reporting on "high-profile incidents" for fear of litigation costs associated with resisting discovery efforts by criminal defense attorneys.

In making its arguments, the Newspaper contends "[r]eporters and sources routinely come to agreements about which information the reporter can publish, and which information the source is providing on background or off the record." But here there is no evidence or allegation that Parra's interview was granted with conditions or stipulations, that he asked for any statements to be considered "off the record," or that he otherwise had any expectation of confidentiality. We agree with Roberts's observation that defendants who are willing to grant jailhouse interviews without conditions are presumably aware that whatever they say "is fair game to be published." Unless the interviewee makes statements "off the record" or negotiates some form of content control, the interviewee does not know what information will be selected for publication.

Furthermore, indulging the presumption that criminal defendants keep abreast of legal developments in this area, this class of potential interviewees is already aware that reporters can be compelled to testify about statements attributed to a criminal defendant in a published article. (See, e.g., *Frederickson*, *supra*, 8 Cal.5th at pp. 1014–1016; *Ramos*, *supra*, 34 Cal.4th at pp. 523–525; *Sanchez*, *supra*, 12 Cal.4th at pp. 49–50; *Vasco*, *supra*, 131 Cal.App.4th at pp. 149–151.) The Newspaper fails to explain why a defendant who is otherwise willing to grant an interview without any promise or expectation of content control—and is thus without knowledge of what information the newsperson will choose to publish—would make a different choice because of the possibility the journalist's unpublished notes might be discoverable. The superior court

51.

did not abuse its discretion by giving little credence to this undeveloped and unsubstantiated theory.

The Newspaper's argument regarding the deterrent effect of potential litigation costs is similarly undeveloped and unsubstantiated. Although this case presents a novel fact pattern, the California Supreme Court declared in 1990 that "a newsperson's protection under the shield law must yield to a criminal defendant's constitutional right to a fair trial when the newsperson's refusal to disclose information would unduly infringe on that right." (*Delaney*, *supra*, 50 Cal.3d at p. 793.) This is not the first time a defendant has attempted to overcome the protections of the shield law. In a scenario like this one, where one defendant is facing LWOP based on the accusations of a codefendant, discovery efforts in response to the codefendant's jailhouse interview with a reporter are highly likely. Such efforts may even be required by the defendant's right to effective assistance of counsel. The Newspaper's argument necessarily posits that a different outcome here would dissuade competent defense attorneys from making similar discovery efforts in future cases, which we do not find persuasive.

### c. The importance of the information to the criminal defendant

"A defendant in a given case may be able not only to meet but to exceed the threshold 'reasonable possibility' requirement. … If so, the balance will weigh more heavily in favor of disclosure than if he could show only a reasonable possibility the evidence would assist his defense." (*Delaney*, *supra*, 50 Cal.3d at p. 811.) The Newspaper argues this factor weighs in its favor because the likelihood of Roberts finding anything materially helpful in the reporter's notes is low.

The Newspaper confuses the "importance of the information" with the probability of it being helpful to the defense. Although the *Delaney* reporters were subpoenaed by defense counsel, it was the *prosecutor* who first sought their testimony as to whether the defendant had consented to a search. (*Delaney*, *supra*, 50 Cal.3d at p. 794.) Later,

52.

"Delaney and the People … filed a joint petition in the Court of Appeal seeking to vacate the orders of the superior court that granted the reporters' habeas corpus petitions." (*Ibid.*; see *id*. at p. 816, fn. 34 ["This case is somewhat unusual in that both Delaney and the prosecutor are seeking the reporters' testimony"].)

The facts of *Delaney* did not show a high probability of success for the defense. Indeed, the odds of the testimony helping Delaney may have been low. But the *potential* benefit was high, which is why the information was deemed important. (*Delaney*, *supra*, 50 Cal.3d at pp. 811, 814–815.) Roberts is facing LWOP. His threshold showing may have been weaker than the showing in *Delaney*, but the information he seeks is not unimportant. The superior court's conclusion in that regard was not outside the bounds of reason.

### d. Whether there is an alternative source for the unpublished information

Prior to *Delaney*, appellate courts required defendants seeking to overcome shield law immunity to show the unpublished material was not available by "less intrusive" means. (E.g., *Hammarley v. Superior Court* (1979) 89 Cal.App.3d 388, 399.) A concurring opinion in *Delaney* endorsed a similar two-part threshold burden, with the second part requiring "that no alternative source of information is available." (*Delaney*, *supra*, 50 Cal.3d at p. 820 (conc. opn. of Mosk, J.).) However, the *Delaney* majority held "that a universal and inflexible alternative-source requirement is inappropriate in a criminal proceeding." (*Id*. at p. 812.)

"The obvious purpose of the alternative-source requirement is to protect against unnecessary disclosure of a newsperson's confidential or sensitive information. Where the information is shown to be not confidential or sensitive, the primary basis for the requirement is not present and imposing a rigid requirement would be to sustain a rule without a reason." (*Delaney*, *supra*, 50 Cal.3d at pp. 811–812.) Accordingly, the existence of an alternative source is only one of several factors in *Delaney*'s balancing

test. "In considering whether the requirement is appropriate in a given case, the trial court should consider the type of information being sought (e.g., names of potential witnesses, documents, a reporter's eyewitness observations), the quality of the alternative source, and the practicality of obtaining the information from the alternative source." (*Id.* at pp. 812–813.) "In short, whether an alternative-source requirement applies will depend on the facts of each case." (*Id.* at p. 813.)

Roberts construes this factor narrowly. He argues the information at issue is Parra's statements to the reporter, and there is no alternative source. In the proceedings below, he submitted evidence of his attempts to obtain a recording of the interview from the Kern County Sheriff's Office (which operates the jail where the interview took place). This evidence showed there was a surveillance camera in the room where the interview was conducted, but no audio was recorded.

Roberts does not address the possibility of the reporter being an alternative source. However, the Newspaper's motion to quash included a request for "an order barring Defendant Roberts from issuing a trial subpoena to [the reporter]." Therefore, obtaining unpublished information from the reporter was not a practical option without judicial intervention.

The Newspaper construes this factor broadly, arguing it weighs against compelled disclosure when there are "alternative sources for the same *kinds* of information." (Italics added, boldface omitted.) In essence, the Newspaper contends all impeachment evidence has equal value. Therefore, because Parra's credibility can be impeached with the preliminary hearing transcript, Roberts has no real need for any impeachment evidence reflected in the reporter's notes.

The Newspaper's position is not persuasive. There is one source, however, that the superior court should have asked about. According to the article, Parra was interviewed by police a second time following the preliminary hearing. This alleged second interview was basically ignored during the motion proceedings. Roberts's

54.

briefing to this court includes a footnote alleging as follows: "While [Parra] had told a District Attorney investigator after the preliminary hearing that he had his firearm with him at the scene, in that same interview, he first concocted new excuses about where his firearm was and initially denied that he had his firearm with him at the scene."

Our record does not confirm Parra was in fact interviewed a second time. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11 ["the unsworn statements of counsel are not evidence"].) The record is also silent as to whether a transcript of the alleged interview was available during the motion proceedings. If such evidence was available, it would have allowed the superior court to make a more informed decision in balancing the parties' respective interests. On the other hand, since it appropriately found the Newspaper's unpublished material is neither confidential nor sensitive, the superior court had discretion to give less weight to the fourth factor. (See *Delaney*, *supra*, 50 Cal.3d at pp. 811–812.) For all the reasons discussed, we conclude the superior court did not abuse its discretion by denying the Newspaper's motion to quash.

## III.    In Camera Proceedings Were Warranted

For the guidance of all concerned in this matter, and for trial courts and litigants in future cases, we make the following observations regarding in camera review.

"When a defendant has issued a subpoena to a person or entity that is not a party for the production of books, papers, documents, or records, or copies thereof, the court may order an in camera hearing to determine whether or not the defense is entitled to receive the documents." (Pen. Code, § 1326, subd. (d).) "'[T]he defense is not required, on pain of revealing its possible strategies and work product, to provide the prosecution with notice of its theories of relevancy of the materials sought.'" (*Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1075.) "Instead, a defendant may make '"an offer of proof at an in camera [and ex parte] hearing."'" (*Facebook*, *Inc. v. Superior Court* (*Touchstone*), *supra*, 10 Cal.5th at p. 357, fn. 14, quoting *ibid*.)

Roberts's briefing to the superior court alleged the need to "present his theories of relevancy" in camera "to avoid the 'Hobson's choice of going forth with his discovery efforts and revealing possible defense strategies and work product to the prosecution, or refraining from pursuing [those] discovery materials to protect his constitutional rights and prevent undesirable disclosures to his adversary.'" (Quoting *People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1321.) The request could have been granted. (Pen. Code, § 1326, subd. (d); see, e.g., *Ramos*, *supra*, 34 Cal.4th at p. 524.) The superior court did not explain why it denied the request, but the Newspaper's strong opposition to it may have influenced the decision.

In camera proceedings are not required if the information protected by the shield law is neither confidential nor sensitive. "When a criminal defendant, however, seeks confidential or sensitive information, the practical need for an in camera hearing is obvious. The shield law would be illusory if a reporter had to publicly disclose confidential or sensitive information in order for a court to determine whether it should remain confidential or sensitive." (*Delaney*, *supra*, 50 Cal.3d at p. 814.) "The court has discretion in the first instance to determine whether a newsperson's claim of confidentiality or sensitivity is colorable. If the court determines the claim is colorable, it must then receive the newsperson's testimony in camera." (*Ibid*.)

In its briefing on the motion to quash, the Newspaper described the subpoenaed material as both "extremely sensitive" and "confidential." If the Newspaper genuinely held this belief, it should have been arguing *for* rather than *against* in camera review of the material. The *Delaney* opinion emphasizes "that a trial court need not waste its valuable resources for an in camera hearing based on a specious claim of confidentiality or sensitivity." (*Delaney*, *supra*, 50 Cal.3d at p. 814.) We would add that parties who invoke the shield law should not be allowed to blow hot and cold on the issues of confidentiality/sensitivity and the propriety of in camera review.

The superior court was not required to review the Newspaper's unpublished material in camera, but it had discretion to do so.  (*Delaney*, *supra*, 50 Cal.3d at p. 814; Pen. Code, § 1326, subd. (d)).  Production of the material for that purpose would not have waived any protections of the shield law.  (*Sci-Sacramento*, *Inc. v. Superior Court* (1997) 54 Cal.App.4th 654, 661.)  "Moreover, the better policy is to encourage parties to allow disputed materials to be examined by the trial court in camera, because the court's review may resolve the matter expeditiously and short of a contempt adjudication."  (*Id*. at p. 662.)

## DISPOSITION

The petition is granted in part.  Let a writ of mandate issue directing the respondent court to vacate its order of May 24, 2023, adjudging petitioner in contempt. In all other respects, the petition is denied.  All parties shall bear their own costs in this proceeding.

PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


MEEHAN, J.

57.